UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

        v.

14.84227603 BITCOIN FORMERLY ON DEPOSIT IN KRAKEN ACCOUNT NO. AA28 N84G W7NH VBWY; and

14.8422712 BITCOIN CASH FORMERLY ON DEPOSIT IN KRAKEN ACCOUNT NO. AA28 N84G W7NH VBWY;

        Defendants-*in-rem*.

**VERIFIED COMPLAINT FOR FORFEITURE**

26 Civ. 1909

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

    Plaintiff United States of America, by its attorney, Jay Clayton, United States Attorney for the Southern District of New York, for its verified complaint alleges, upon information and belief, as follows:

### I.  JURISDICTION AND VENUE

    1.    This is a civil action *in rem* commenced by the United States of America pursuant to Title 18, United States Code, Sections 981 and 982 and Title 21, United States Code, Sections 881 and 853, seeking the forfeiture of the following:

        a.  14.84227603 Bitcoin ("BTC") formerly on deposit in Kraken Account No. AA28 N84G W7NH VBWY (the "Subject Kraken Account"); and

1

      b. 14.8422712 Bitcoin Cash ("BCH") formerly on deposit in the Subject Kraken Account

(a. and b., together, the "Defendants-*in-rem*").

    2. This Court has jurisdiction pursuant to Title 28, United States Code, Sections 1345 and 1355.

    3. Venue is proper under Title 28, United States Code, Section 1355(b)(1)(A) because acts and omissions giving rise to forfeiture took place in the Southern District of New York.

    4. The Defendants-*in-rem* are presently in the custody of the United States Department of Homeland Security, Homeland Security Investigations ("HSI").

## II.   BACKGROUND

A. <u>Silk Road</u>

    5. Silk Road was an online "darknet" black market in operation from approximately 2011 to 2013. Silk Road was used by drug dealers and other unlawful vendors to distribute massive quantities of illegal drugs and other illicit goods and services. Silk Road was also a means for laundering the proceeds of narcotics distribution and the sale of other illicit goods and services.

    6. Silk Road was designed to facilitate anonymous illegal transactions beyond the reach of law enforcement, including by hosting the site on the Tor network, an encrypted private network that permits its users to surf the internet anonymously through various means, including by concealing its users' identities and IP addresses.

    7. The illegal nature of the items sold on Silk Road was readily apparent to any user browsing its offerings. The vast majority of goods for sale on that platform consisted of illegal

drugs, which were openly advertised on the site as such, and were immediately and prominently visible on the site's home page. The offerings for sale on the site at any single time amounted to multi-kilogram quantities of heroin, cocaine, and methamphetamine, as well as distribution quantities of other controlled substances, such as LSD.

8. In addition to illegal narcotics, other illicit goods and services were openly sold on Silk Road, including illegal computer hacking services, malicious software (such as password-stealing programs), forged identity documents, stolen financial and/or identity information, and murder-for-hire or "hitman" services.

9. Silk Road retained certain information regarding users that accessed the site. For example, each user's Silk Road profile listed "Items for sale," which detailed the items that the user offered for sale on Silk Road (e.g., various narcotics) and included the total amount of offers made by Silk Road buyers for each listing. Each user's profile also listed "Items sold" that maintained details regarding the user's sales on the platform.

10. Silk Road's "forum" also contained extensive guidance on how to evade law enforcement. It included, for instance, numerous posts by users offering advice to other users on how they should configure their computers so as to avoid leaving any forensic trace of their use of Silk Road.

11. The only form of payment accepted on Silk Road was the digital currency BTC.

12. Silk Road operated as an "escrow marketplace," where user funds were treated similarly to funds in a bank account. When users wished to add funds, the market provided a BTC "deposit address," similar to a bank account number. The market, which controlled this deposit address, received any funds sent to it and provided a corresponding credit to the user's escrow account.

13. Once funds had been credited to a user's account, that user could purchase products from vendors operating on the Silk Road market. Upon completion of such a purchase, the market debited the order value from the user's account and credited the value to the vendor's account. Similar to intra-bank transactions, the ordering process required adjusting the balances recorded for the user's account and vendor's account; no BTC was actually transferred.

14. Conversely, when users wished to withdraw funds, they provided a BTC "withdrawal address" to the market. The market would send the requested funds from its "cryptocurrency wallet" to that address and debit a corresponding amount from the user's account.

15. Silk Road charged a commission for every purchase conducted by its users. The commission rate varied between approximately 8 to 15 percent per transaction.

16. Further, during its operation, Silk Road made use of a so-called "tumbler" to process BTC transactions in a manner designed to obfuscate the tracking of individual transactions through the blockchain. As described on a Silk Road information, or "wiki," page, Silk Road's tumbler sent "payments through a complex, semi-random series of dummy transactions . . . making it nearly impossible to link your payment with any [BTC] coins leaving the site." In other words, if a buyer made a payment on Silk Road, the tumbler helped obscure any link between the buyer's BTC address and the vendor's BTC address so as to ensure anonymity at each end of the transaction. By default, all transactions on the BTC blockchain—a decentralized online ledger of all BTC transactions—are public, that is, anyone with the means of accessing the blockchain can trace all transaction activity on it. The purpose of Silk Road's tumbler was to make transactions within the Silk Road ecosystem more difficult, if not impossible, to trace on the blockchain, thus preserving the anonymity of Silk Road's buyers and sellers. On information and belief, an important and common function served by such tumblers is to assist with the concealment of

criminal proceeds and the promotion of criminal activity.

17. Beginning in or about November 2011, certain United States law enforcement agents made multiple undercover purchases of controlled substances from Silk Road vendors using the Silk Road platform. Some of those purchases were placed from the Southern District of New York. For several such purchases, the controlled substances purchased using the Silk Road platform were shipped by Silk Road vendors to the Southern District of New York.

B. Mt. Gox

18. Mt. Gox was a BTC exchange platform based in Tokyo, Japan that was launched in or about 2010.

19. Mt. Gox enabled its customers, for a fee, to exchange fiat currency, including United States dollars, with BTC. Customers could deposit, store, and withdraw their BTC and fiat currency over the internet through the Mt. Gox website.

20. In or about February 2014, Mt. Gox shut down and entered liquidation proceedings in Japan. The sudden shutdown caused Mt. Gox's estimated 750,000 customers to lose access to their accounts, preventing them from withdrawing their BTC from the exchange.

21. In or about 2018, the Japanese court overseeing the Mt. Gox liquidation appointed a Japanese attorney as Mt. Gox's Rehabilitation Trustee.[1] In or about 2021, a plan was approved wherein billions of dollars of BTC would be paid to satisfy approved claims. Creditors with approved claims were contacted by the Rehabilitation Trustee to verify their account information, and were ultimately informed that they may be eligible to receive a percentage of the funds they had previously held on the Mt. Gox platform at the time of liquidation in satisfaction

---

[1] A "Rehabilitation Trustee" is similar to a Chapter 11 or Chapter 7 Trustee in a federal bankruptcy proceeding, insofar as they help administer the estate and make payments to creditors.

of their bankruptcy claims.

22.     The Mt. Gox Rehabilitation Trustee selected U.S.-based cryptocurrency exchange Kraken, among other exchanges, to receive distributions by the Trustee to Mt. Gox's creditors.

23.     In or about July 2024, the Mt. Gox Rehabilitation Trustee made a large, lump sum transfer of BTC and BCH to Kraken in satisfaction of multiple Mt. Gox creditors' claims

### III.     PROBABLE CAUSE FOR FORFEITURE OF THE DEFENDANTS-IN-REM

24.     Among Silk Road's users was "DRamsterdam." DRamsterdam sold multiple controlled substances on the Silk Road platform, including cocaine and MDMA, to, among others, United States customers, in exchange for BTC. Cocaine and MDMA are both controlled substances under the federal Controlled Substances Act.

25.     On or about August 11, 2012, an individual named Etienne Brinkman ("Brinkman") opened an account at Mt. Gox (the "Brinkman Mt. Gox Account"). As a part of Mt. Gox's account opening process, Brinkman provided his legal name, date of birth, residential address, and email address.

26.     On or about July 4, 2013, approximately 21 BTC in narcotics proceeds were transferred from the Silk Road user DRamsterdam's account and deposited into the Brinkman Mt. Gox Account.

27.     Following the Mt. Gox bankruptcy, Brinkman designated the Subject Kraken Account to receive funds from Mt. Gox's Rehabilitation Trustee. Prior to approving the opening of the Subject Kraken Account, Kraken had required Brinkman to submit his name, and date of birth. This information matches the information provided to Mt. Gox in connection with the opening of the Brinkman Mt. Gox Account.

28. In or about 2017, the developers of BTC released BCH as a so-called "fork" of BTC, which, among other things, automatically granted to holders of BTC an approximately identical amount of BCH. Accordingly, any BCH derived from Silk Road user DRamsterdam's narcotics sales that remained in the Brinkman Mt. Gox Account at the time Mt. Gox declared bankruptcy and froze its customers' accounts also constitutes proceeds from the sale of narcotics and property involved in money laundering.

29. At the time of the Mt. Gox liquidation, approximately 14.84227603 BTC and 14.8422712 BCH—i.e., the Defendants-*in-rem*—remained in the Brinkman Mt. Gox Account, which property was then transferred to the Subject Kraken Account.

30. On or about March 25, 2025, the Honorable Magistrate Judge Valerie Figueredo issued a warrant authorizing the seizure of the Defendants-*in-rem*.

31. On or about April 28, 2025, the Government seized the Defendants-*in-rem*.

32. Based on the foregoing, there is probable cause to believe that the Defendants-*in-rem* constitute proceeds of narcotics trafficking and property involved in money laundering and monetary transactions involved with criminally derived property (namely, narcotics trafficking).

IV. **FIRST CLAIM FOR FORFEITURE**

33. Incorporated herein are the allegations contained in paragraphs one through thirty-two of this Complaint.

34. Title 21, United States Code, Section 881(a)(6) subjects to forfeiture all "moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of [Subchapter I of Title 21], all proceeds traceable to such an exchange, and all moneys, negotiable

instruments, and securities used or intended to be used to facilitate any violation of [Subchapter I of Title 21]."

35. The Defendants-*in-rem* are subject to forfeiture pursuant to Title 21, United States Code, Section 881(a)(6) because there is probable cause to believe that the Defendants-*in-rem* constitute moneys furnished or intended to be furnished by any person in exchange for a controlled substance and proceeds traceable to such an exchange, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

## V.   SECOND CLAIM FOR FORFEITURE

36. Incorporated herein are the allegations contained in paragraphs one through thirty-two of this Complaint.

37. Title 18, United States Code, Section 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property."

38. Title 18, United States Code, Section 1956(a)(1)(B)(i) imposes criminal penalties on any person who:

> knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . .
>
> knowing that the transaction is designed in whole or in part (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity[.]

39. Under Title 18, United States Code, 1956(c)(7)(A), "specified unlawful activity," includes, among other things, "any act or activity constituting an offense listed in section 1961(1) of this title." Title 18, United States Code, Section 1961(1) lists as an offense

"racketeering activity," which includes, among other things, "any act ... dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year."

40. By reason of the foregoing, the Defendants-*in-rem* are subject to forfeiture to the United States of America pursuant to Title 18, United States Code, Section 981(a)(1)(A), because the Defendants-*in-rem* constitute property involved in money laundering transactions that derive from specified unlawful activity, to wit, illegal narcotics trafficking.

[continued on next page]

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendants-*in-rem* and that all persons having an interest in the Defendants-*in-rem* be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendants-*in-rem* to the United States of America for disposition according to law, and that this Court grant plaintiff such further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: New York, New York
      March 9, 2026

                                      JAY CLAYTON
                                      United States Attorney for the
                                      Southern District of New York
                                      Attorney for the Plaintiff
                                      United States of America

By:    \_\_\_/s/_____
          T. Josiah Pertz
          Assistant United States Attorney
          26 Federal Plaza
          New York, New York 10278
          Tel. (212) 637-2246

## VERIFICATION

| | |
|---|---|
| STATE OF NEW YORK | ) |
| COUNTY OF NEW YORK | : |
| SOUTHERN DISTRICT OF NEW YORK | ) |

MATTHEW MACCHIAROLI, pursuant to Title 28, United States Code, Section 1746, hereby declares under penalty of perjury that he is a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI"); that he has read the foregoing Verified Complaint and knows the contents thereof; that the same is true to the best of his knowledge, information and belief; and that the sources of his information and the grounds of his belief are his personal involvement in the investigation, and conversations with and documents prepared by law enforcement officers and others.

Executed on March 9, 2026

_____
Matthew Macchiaroli
Special Agent
Homeland Security Investigations